Argued November 27, 1951, affirmed February 20, 1952

# BIRKS *v.* EAST SIDE TRANSFER CO.

241 P. 2d 120

8

*Howard K. Beebe* argued the cause for appellant. With him on the brief were Walter J. Cosgrave and Maguire, Shields, Morrison & Bailey, all of Portland.

*Robert A. Bennett* and *Walter H. Evans, Jr.,* argued the cause for respondent. On the brief were Robert A. Bennett and Krause, Evans & Korn, all of Portland.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, LATOURETTE and WARNER, Justices.

ROSSMAN, J.

This is an appeal by East Side Transfer Company from a judgment, based upon a verdict, which was entered against it. A second defendant, Clyde Hollenbeck, was absolved by the jury from the charges made in the complaint and is not a party to this appeal. The action out of which the challenged judgment arose was based upon charges of negligence made against both defendants and averments that, as a result of the negligence, the plaintiff suffered a personal injury.

According to the plaintiff-respondent, he was injured June 14, 1948, at 4:30 p. m., when a motorcycle which he was riding collided virtually simultaneously with an automobile which the defendant, Hollenbeck, was operating and a parked combination tractor and trailer which was owned by the defendant-appellant, East Side Transfer Company. Since Hollenbeck is not a party to this appeal, we shall, for the purposes of convenience, refer to the defendant-appellant as the defendant. We shall also refer to the latter's vehicle as a truck.

The appealing defendant, East Side Transfer Company, submits only one assignment of error. It reads:

"The court erred in overruling appellant's motion for a directed verdict."

In arguing in behalf of that assignment of error, the defendant submits these propositions:

"Plaintiff was guilty of negligence which caused or contributed to his injuries; and he is, therefore, barred as a matter of law."

"Appellant's conduct in parking its vehicle was not the legal cause of plaintiff's injuries."

"The negligent conduct of plaintiff and the innocent acts of Mr. Hollenbeck were independent, intervening forces which relieve appellant of liability."

■ We shall now give a review of the evidence. Where the latter presents conflicts, we shall, as our duty requires, accept the version favorable to the plaintiff-respondent.

As we have said, the plaintiff sustained his injury when his motorcycle collided with an automobile which the defendant, Hollenbeck, was operating and a parked truck which was owned by the defendant. The mishap occurred in Portland upon Southeast 20th avenue at a point 120 feet south of the intersection of that thoroughfare and Hawthorne street. The plaintiff, riding his motorcycle, was proceeding south on 20th avenue and was overtaking Hollenbeck's car which was moving in the same direction. Ahead of these two vehicles was the defendant's truck. It had been backed across the sidewalk on the east side of 20th avenue and against a low embankment. While in that position the truck's driver and some helpers were loading the vehicle with heavy objects. The truck's total length was 34 feet and nine inches. It had occupied that position more than an hour before the mishap occurred.

The plaintiff was 30 years of age and had operated motorcycles for many years. He was familiar with Southeast 20th avenue. The day of the accident was dry and clear. Southeast 20th avenue, at the place with which we are concerned, is level. It is an arterial thoroughfare and carries a volume of traffic which the witnesses described as "rather heavy" and "very heavy." At the situs of the accident the space between curbs is 30 feet, but immediately to the north the width is 35 feet.

An ordinance of the city of Portland reads as follows:

"No person shall permit a vehicle in his charge to remain backed to the curb of any street except

while engaged in actually loading or unloading the same, and then only when it is absolutely necessary for the purpose owing to the weight or size of the merchandise being handled, and in no event shall it be permissible to allow such vehicle so to remain for a greater period than twenty minutes. The motive power attached to any vehicle so backed to the curb shall be turned parallel to the curb and in the direction in which traffic is required to be moved upon the same side of the street except that in case of a truck and trailer combination the truck shall be removed and parked separately.''

A glance at the accompanying sketch [which was not drawn to scale] may be helpful in understanding the facts.

The trailer part of the defendant's vehicle stood at an angle of about 90 degrees to the property line, but the tractor part faced in a northwesterly direction. The witnesses estimated the degree of the angle variously in the neighborhood of 30 to 45 degrees. The tractor part was 17 feet long. The defendant's driver conceded that he could have turned the tractor further so that it would have been parallel to the curb. The front of the tractor extended across the center line of the street, but no witness mentioned in feet or inches how far it projected beyond the center line. One of them expressed the situation in these words: "The truck did protrude well into the center of the street. I would say past the point of center on the street." Another described it in this manner: "extended over the center of the street. It took up more than half" of the street.

Across the street from the truck, that is, next to the west curb, was a row of parked cars. One of them was directly opposite the truck. The plaintiff, referring to the space between that parked car and the front of the truck declared:

"I believe there was just barely room for a car to go through, which would be, I imagine, seven or eight feet, if that much.

"Q You would estimate about eight feet of distance? A Yes, sir."

The only evidence upon the subject indicates that automobiles are about six or seven feet wide. Witnesses, in alluding to the space between the front of the truck and the opposite parked car, used terms such as "the opening" and "the hole." Hollenbeck repeatedly employed the term "the hole" and limned the resulting situation in these words: "a one-way traffic condition." The driver of the truck testified that dur-

ing the hour or more in which it stood there "a lot of cars and trucks" passed through the opening.

We have mentioned the fact that Southeast 20th avenue, at the place where the accident occurred, is 30 feet wide from curb to curb. One half of that space is 15 feet. Since the backed-up truck occupied more than 15 feet, there was less than 15 feet of unoccupied space in the west half of the street. If the car which was parked next to the west curb was six feet wide and stood a couple of inches from the curbstone, one can readily understand that the opening between the front of the truck and the left side of the parked car was approximately eight feet wide, and was less than eight feet if the parked car was more than six feet wide.

The plat which accompanies this opinion shows Hollenbeck's car, but no claim is made that it is placed in its exact position. Proceeding at a speed of about 15 miles an hour, it approached the opening from the north, but when Hollenbeck noticed two cars coming from the south that were about to enter the opening, he stopped and permitted them to go through. He thought that he was "approximately 30 or 40 feet from the opening" when he stopped.

Evidently the backed-up truck and the cars across the street created a difficult situation, for we observe from the record that the men who were loading the truck diverted their attention from time to time to the traffic. Two of them were able to give impressions of the number and kind of vehicles which moved through the opening. One of them, whose attention was attracted by the Hollenbeck car as it stood motionless "two or three minutes, whatever time it took," waiting for an opportunity to pass through the opening, accounted for his interest in this manner: "I was

standing there merely watching this procedure, knowing that this was kind of congested."

About the time that the Hollenbeck car had reached the point which we mentioned, the plaintiff and a companion, Eugene W. Wilson, each riding a motorcycle, were going south on Southeast 20th avenue. They were proceeding in single file with Wilson in the lead. By reverting to the plat, it will be seen that Southeast 20th avenue makes a jog at Hawthorne street. Both are arterial streets. The plaintiff and Wilson approached Hawthorne street from the north and stopped at Hawthorne before entering it. After they had made the stop, the two riders turned to the left, entered Hawthorne and shortly turned to the right in order to continue their course south on that part of 20th. When the riders had cleared the two-story building on the southwest corner, which is shown upon our plat, they obtained a view down 20th avenue. Upon reaching that point they saw the defendant's truck and also the Hollenbeck car. They described their speed as approximately 20 miles an hour as they turned from Hawthorne into 20th and approached the Hollenbeck car.

Wilson, who was in the lead, gave the following account of the conditions as they existed immediately prior to and at the moment of the impact:

"Well, Mr. Hollenbeck's car was stopped, and as I was about to enter the opening to just go around Mr. Hollenbeck and. go on, there was no traffic coming north on Southeast 20th; but I decided I hadn't ought to do that because I would be turning in front of my—Mr. Birks, who was immediately behind me. So I just pulled off to the left and stopped to let Mr. Birks go through first, rather than cause any carelessness. And as Mr. Birks started to go around Mr. Hollenbeck's car, the car suddenly started up, and, as Mr. Birks came along-

side, and started to go through itself and trapped Mr. Birks between the car and the truck.''

It will be observed that when the two motorcycles approached the opening, Wilson, in the lead, turned to the left and stopped so that the plaintiff could go through. He explained his act by saying that if he had undertaken to go through the opening first ''I would be turning in front of'' the plaintiff, who was to his right and 15 feet or so to his rear. Thus it appears that if Wilson had sought to continue on his course he would have had to veer into the plaintiff's path and endanger the plaintiff's safety. Not wishing to do so, he took himself out of the plaintiff's way by turning to his left.

Wilson thought that the Hollenbeck car was about ''50 to 75 feet'' ahead when he first saw it and that it was moving slowly. Presently it paused or hesitated. When it reached a point ''25 or 30 feet'' from the truck, it came to a complete stop, according to him.

The plaintiff testified that he saw the truck and the Hollenbeck car when he rounded the corner. He was then, according to his estimate, about 60 feet to the rear of the car and it was 50 feet or more from the truck. It was moving ''very slowly,'' so he believed, and, after stopping about 50 feet from the opening, resumed movement but stopped again when it was nearly a car length from the truck. He reckoned a car length as approximately 15 or 16 feet. When the Hollenbeck car made its second stop, the plaintiff was to the right of Wilson and 10 feet behind him. After the Hollenbeck car had stood motionless for ''something'' like a second or two, and the plaintiff saw no vehicle approaching from the south, he concluded that he could pass safely through the opening. He, therefore, continued on his way, but when he was ''right alongside''

Hollenbeck, the latter, without giving any warning, started his car and headed directly for the opening. When that occurred, the plaintiff was so close to the truck that he could not stop. He estimated his speed as about 20 miles an hour and found it "hard to say" how fast Hollenbeck was going because "when a person starts from a stop they are increasing speed all the time." The following is from his cross-examination:

"Q So, as I gather from you, you determined there was plenty room there for you to make it and if he hadn't started up you would have made it all right, is that your idea? A. Yes, sir."

At another point he explained, "I just went, started to go around him [Hollenbeck] through the opening, when he started up and cut me off." It was in that way that the collision occurred. The plaintiff was positive that he kept his eyes upon the Hollenbeck car and the situation ahead as he approached the opening. He was unable to say whether he struck first the Hollenbeck car or the truck. He thought that it was "the front end" of the Hollenbeck car with which he collided.

Such is the portrayal of the crucial facts as expressed in terms most favorable to the plaintiff. In simplifying the account, we omitted in many instances the ubiquitous "about" and "approximately" with which the witnesses guarded their estimates, beliefs and calculations. Counsel for Hollenbeck, in cross-examining the plaintiff and some of the witnesses, employed extensively a blackboard and thereby afforded the jury a superior means of gaining an impression of the critical facts. We may again mention the blackboard and the many drawings which were made upon it.

We deem it essential at the outset to determine whether or not the ordinance which we quoted created a duty upon the part of truck owners, who back their

vehicles to the curb, in favor of other users of the city streets. The violation in the present instance was twofold: the truck remained at the place where it was parked for more than the lawful period of 20 minutes, and the motive power unit was not turned parallel to the curb. A disregard to a substantial extent of the requirement that the motive power unit must be turned parallel to the curb narrows, to a greater extent than authorized by law, the part of the street which remains available for traffic. Any vehicle which is backed to a curb obstructs traffic, and any obstruction the size of a motor truck, when placed in a narrow street like Southeast 20th avenue may cause traffic to be diverted into a narrow channel, thereby increasing the hazard of those who thread the street. Manifestly, the purpose of the ordinance is to prevent obstructions to traffic and to keep the streets in a safe condition for those who use them. Back of that purpose is the fundamental one: to prevent the accidents which occur when unnecessary obstructions are placed in the streets, especially obstructions which confine traffic to an insufficient amount of space. Since the objective of the ordinance is the safety of all who travel the streets, the duty to comply with its demands is imposed, in part, for their benefit. The following, selected at random from our previous decisions, support our conclusions: *O'Brien v. Dunigan,* 187 Or 227, 210 P2d 567; *Martin v. Oregon Stages, Inc.,* 129 Or 435, 277 P 291; *Townsend v. Jaloff,* 124 Or 644, 264 P 349; and *Lowell v. Pendleton Auto Co.,* 123 Or 383, 261 P 415.

Generally, the violation of an enactment which imposed a duty for the protection of others is deemed negligence per se, and if, as a proximate result of it, a member of the class for whose benefit the enactment was passed sustained injury, he may maintain a right

of action, unless he was guilty of contributory negligence: *Speight v. Simonsen,* 115 Or 618, 239 P 542, 43 ALR 1149; *Northwest Door Co. v. Lewis Inv. Co.,* 92 Or 186, 180 P 495; *Morgan v. Bross,* 64 Or 63, 129 P 118.

We do not believe that the defendant contravenes any of the foregoing. Its position is that the plaintiff was guilty of contributory negligence and that the unlawful parking of the truck was not the proximate cause of plaintiff's injury. It argues that the plaintiff's purported contributory negligence and Hollenbeck's blameless act were superseding forces which relieved the defendant of liability. Its argument that the plaintiff was guilty of contributory negligence goes like this: "Either he failed to stop because he negligently failed to appreciate the peril of attempting to pass the Hollenbeck car and precede it through the opening; or he appreciated the peril and negligently exposed himself thereto." Proceeding with those contentions, the defendant, in its opening and supplementary briefs, cites the following decisions in which the owner or driver of a vehicle, which was left standing upon a thoroughfare, was held not liable when his vehicle was struck by a car operated or occupied by the plaintiff in the case: *Medved v. Doolittle,* 220 Minn 352, 19 NW2d 788; *Ashworth v. Hannum,* 347 Pa 393, 32 A2d 407; *McMillan v. Thompson,* 140 Cal App 437, 35 P2d 419; *Geisen v. Luce,* 185 Minn 479, 242 NW 8; *Hubbard v. Murray,* 173 Va 448, 3 SE2d 397; *Kralik v. LeClair,* 315 Mass 323, 52 NE2d 562; *Fortune v. McGinn,* 23 Tenn App 504, 134 SW2d 898, 139 SW2d 256; *Falk v. Finkelman,* 268 Mass 524, 168 NE 89; *Baker v. Cities Service Oil Co.,* 321 Ill App 142, 52 NE2d 284; *Schultz v. Brogan,* 251 Wis 390, 29 NW2d 719; *Painter v. Bewley Furniture Co.* (La App 1940), 195 So 70; *Kline v. Moyer,* 325 Pa 357, 191 A 43; *Penton v. Sears Roebuck & Co.,* (La

App), 4 So2d 547; *Venorick v. Revetta,* 152 Pa Super 455, 33 A2d 655; *Barnwell v. Solomon,* 59 Ga App 507, 1 SE2d 463; *Bracy v. Lund,* 197 Wash 188, 84 P2d 670; *Zink v. Kessler Trucking Co.,* 8 W W Harr 271, 190 A 637; *Eldredge v. Garrison,* 184 Wash 687, 52 P2d 1240; *Kukacka v. Rock,* 154 Or 542, 61 P2d 297; *Butterfield v. Forrester,* 11 East 60. To the foregoing, we add: *Caylor v. B. C. Motor Transportation, Ltd.,* 191 Wash 365, 71 P2d 162; *Swanson v. Gilpin,* 25 Wash 2d 147, 169 P2d 356; *Flynn v. Bledsoe Co.,* 92 Cal App 145, 267 P 887.

The parties cite several sections of the Restatement of the Law of Torts which phrase the rules governing proximate cause. The Restatement employs the term "legal cause" as preferable to "proximate cause." We shall follow its example.

Section 431 says:

"The actor's negligent conduct is a legal cause of harm to another if
  (a) his conduct is a substantial factor in bringing about the harm,  *  *  *."

Section 432 includes the following:

"(2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be held by the jury to be a substantial factor in bringing it about."

Section 433, 1948 Supp., includes among the considerations which are important in determining whether the actor's conduct is a substantial factor, the following:

"(b) whether the actor's conduct has created a force or series of forces which are in continuous

and active operation up to the time of the harm, * * *;"

Section 435, 1948 Supp., says, in part:

"(2) The actor's conduct is not a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm."

Section 439 follows:

"If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability."

Section 440, in defining "superseding cause", says:

"A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."

Section 442, in enumerating the circumstances which are important in determining whether an intervening force has become a superseding cause, includes the following:

"(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;"

We have read carefully all of the decisions which the appellant cited. In all of the cases in which the parking or stopping upon the roadway was done in contravention of an ordinance or a statute, it was deemed an act of negligence. The ordinances and

statutes which prohibited the parking and stopping upon the roadway were held to be safety measures, and the courts recognized a cause of action in any traveler upon the thoroughfare whose injuries were the proximate result of a violation of the enactment. We shall now go on and give further attention to those of the aforecited decisions which shed light upon the issues which we must determine.

*Kukacka v. Rock,* supra, did not involve a parked car. While defendant Rock was driving his car at nighttime, it left the highway and overturned in a ditch ten feet away. He and his four guests were injured. One of the four, a Dr. Adams, after making a preliminary examination, decided that assistance was needed and, seeing a car approaching upon the nearby road, took a position upon the pavement for the purpose of waving it down. The driver of the approaching car mistook Dr. Adams for a highwayman and, in his efforts to avoid him, lost control of his car. Presently his car entered the ditch, collided with the Rock car and thereby Mrs. Kukacka, the plaintiff in the action, was injured. The decision pointed out that Dr. Adams was not the agent of the defendant. The following is the part in the decision which the defendant stresses:

"It is fundamental that there must be some reasonable limitation of liability for the commission of a tort. The wrongdoer is not liable in the eyes of the law for all possible consequences. He is responsible in damages only for the natural and probable consequences of his negligent act. In the instant case, note the intervening incidents between Rock's negligent act in driving off the highway, overturning his automobile, and plaintiff's injury: Dr. Adams went into the highway for the purpose of securing assistance. In trying to attract the at-

tention of Kukacka, he led the latter to believe him to be a robber. Kukacka's driving was such that he collided with a car entirely off the highway and the plaintiff suffered injury. Can it be said that the natural and probable consequence of Rock's negligence was Mrs. Kukacka's injury? It seems the very statement of the factual situation should dictate that the injuries of which plaintiff complains have no causal connection with the negligent act of Rock. They are not a probable consequence of the negligence charged. The negligence of Rock had substantially come to a rest. It was through the independent and intervening acts of either Adams or Kukacka that the plaintiff was injured. The jury said Adams was not the efficient cause of plaintiff's injury. Hence, we must conclude that responsibility therefor rests upon her husband.''

*Butterfield v. Forrester,* supra, decided in the days when people went about on horseback, stated its facts and governing principles with few words. The defendant, in repairing his house, put a pole across a part of the nearby road, ''a free passage being left by another branch or street in the same direction.'' The plaintiff departed from a ''public house'' at the hour ''when they were just beginning to light candles, but while there was light enough left to discern the obstruction at 100 yards distance.'' Riding ''as fast as his horse could go,'' the plaintiff crashed into the obstruction. Lord Ellenborough, in ruling for the defendant, held:

''A party is not to cast himself upon an obstruction which has been made by the fault of another, and avail himself of it, if he do not himself use common and ordinary caution to be in the right. * * * One person being in fault will not dispense with another's using ordinary care for himself. Two things must concur to support this action, an obstruction in the road by the fault of the defend-

ant, and no want of ordinary care to avoid it on the part of the plaintiff.''

The facts in *Caylor v. B. C. Motor Transportation, Ltd.*, supra, are epitomized as follows in *Bracy v. Lund,* supra:

''* * * There, however, an auto bus blocked the highway so that but 13 feet was left for cars to meet and pass. A drunken driver coming from the rear struck the bus and caromed off into an oncoming car, killing several people. It was held that the question as to whether the blocking of the road was a proximate cause of the collision was for the jury, particularly since the bus driver might have reasonably anticipated that, if he blocked the road, some such accident might happen.''

In *Swanson v. Gilpin,* supra, the plaintiff, a pedestrian, was injured while she was walking at the edge of a road 20 feet wide, but only seven or eight feet of which was available for travel at the place of her injury. The narrow channel was due to the fact that a windrow of paving material lay upon the roadway, and the unlawfully parked automobile of defendant Gilpin was within seven or eight feet of the window. The co-defendant, Mrs. Hardy, driving her automobile, undertook to enter the narrow channel from the driveway of her home and, hampered by the insufficient space, veered in the direction of the plaintiff and struck her. From a judgment in favor of the plaintiff, defendant Gilpin appealed. In affirming the judgment, the court said:

''It was a question of fact for the determination of the jury whether but for the illegal parking of the Gilpin automobile the accident would not have occurred. It was for the jury to determine whether Gilpin thus illegally parking his automobile should have foreseen or reasonably anticipated that injury was apt to follow. The verdict reflects the finding

of the jury that the act of Mrs. Hardy was simply a concurring cause; that while the negligence of Mrs. Hardy was also a proximate cause it merely combined or concurred with the continued effect of appellant Gilpin's negligence to produce the result, but did not supersede it."

In *Flynn v. Bledsoe Co.,* supra, the defendant unlawfully parked his truck at right angles to the curb in a busy street. The truck was 18 feet, 4 inches, long and stood six inches from the curb. Across the street a pile of building material extended 10 or 12 feet from the curb. The street was 52 feet wide and, therefore, the parked truck and the building material obstructed about 29 feet of it. Each side of the truck was equipped with rails which projected 10 to 18 inches from the rear of the truck into the street. A car, in which the plaintiff was riding, while endeavoring to pass the truck, came in contact with the projecting rails, resulting in the plaintiff's injury. The defendant claimed that the driver of the car was guilty of negligence and that the defendant's unlawful parking was not the proximate cause of plaintiff's injury. In affirming judgment for the plaintiff, the opinion said:

"The parking of a vehicle 18 feet and 4 inches in length diagonally on a crowded street of a city is a complete answer in and of itself to the appellant's contention that the traveling public, using said street, was not intended to be benefited by the ordinance under consideration. * * *

"We cannot shut our eyes to the common knowledge, possessed by every one, that automobile drivers on our crowded city streets must keep close watch of on-coming traffic in order to avoid collision therewith, and we cannot assume that the members of the city council of the city of San Diego were any less conscious of this necessity than other people, and therefore did not have in mind the

safety of the general traveling public when enacting an ordinance which, if complied with, would give the widest possible space usable for moving vehicles.

\* \* \*

" \* \* \* \* \* \*

"Here the liability of the defendant is on account of its negligence in parking the automobile. Without this negligent act the lawful act of the driver of the automobile in traversing C street would not have resulted in any injury. Thus the proximate cause of the injury was the wrong of the defendant in leaving an automobile parked in such a manner as to be dangerous to the traveling public."

In the Medved, Zink and Eldredge cases, only the unlawfully parked vehicles and the colliding cars were upon the thoroughfares. In each case the plaintiff was a passenger in the colliding car. In each there was ample space to the left of the parked vehicle for a safe passage for the overtaking one. In the Medved and Eldredge cases the negligence of the driver of the overtaking car was clear; in the Zink case it appeared by necessary inference. Thus, in those cases, both the parked and the overtaking cars were negligent. The question then occurred whether their combined negligence or the negligence of only one was the legal cause of the plaintiff's injuries. In all of them, the courts, without resorting to the language of the Restatement, expressed the belief that the negligence of the driver of the parked car was not "actively and continuously" in operation when the collision occurred. In each instance it deemed it "extraordinary rather than normal" for the parked vehicle to have been struck. The negligence of the driver of the colliding car was viewed as an intervening cause and as one that had superseded or insulated that of the parked car.

In the Fortune case, the plaintiff was the operator of the bus which collied with the defendant's parked car. The street upon which the collision occurred was four lanes broad. The court held that the plaintiff was negligent. That holding, of course, rendered it impossible for him to recover.

In the Ashworth, McMillan, Geisen, Hubbard, Kralik, Kline, Penton and Bracy cases, the injuries occurred when a car which sought to overtake the unlawfully parked vehicle encountered one coming from the opposite direction. In each instance, the parked vehicle was in plain view and was seen in ample time. In each there was sufficient room to the left of the parked vehicle so that no collision would have occurred had other traffic observed due care. The courts held that the negligence of either or both of the colliding cars had superseded that of the parked vehicle.

In the Falk case, the unlawfully parked car, together with an obstruction on the other side of the street, both of which were plainly visible, narrowed the part of the street available for traffic, but the collision which took place in the nearby street intersection was one which the court termed "only remotely and slightly probable." The decision did not mention the Restatement, but had it done so it, no doubt, would have referred to the collision as one where "looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm." In other words, the court deemed that the parked automobile was not a substantial factor in bringing injury to the plaintiff.

In the Schultz case, the motorist did not collide with the unlawfully parked car, but struck some nearby pedestrians. The fact that the car extended one foot

further into the road than was permissible was not regarded as a substantial factor in bringing harm to the pedestrians.

In the Swanson and Flynn cases, the unlawful parking confined traffic to a narrow channel. In the Caylor case, the unlawful parking was deemed a hazardous obstruction upon the roadway. In each of the three cases the plaintiff was free from negligence. The courts in each of those cases affirmed judgment for the plaintiff which was based in part upon findings that the unlawful parking was a legal cause of the plaintiff's injuries. In other words, the court found that the negligence of the unlawful parker was "in continuous and active operation up to the time of the harm."

In none of the cases which we reviewed were the facts closely akin to those before us. We gave them attention because they illustrate the significance of the terms "substantial factor", "intervening force", "superseding cause", "continuous and active operation up to the time of the harm" and "highly extraordinary that it should have brought about harm", all of which terms are employed in the Restatement.

The unlawful act of an owner, who places a large vehicle across an arterial city street in such a manner that it and cars that are lawfully parked create a hazardous one-way traffic channel, is materially different from the act of another who stops his vehicle upon a country road in a place where it can be plainly seen and who, in so stopping, leaves ample space for other travelers upon the road. An unlawful parker of the first type knows that all who attempt to pass through the narrow opening will be subjected to the risks which his unlawful act produces. He knows that the risks and hazards created by his partial blockade of the street will continue as long as his vehicle remains

in its position. Common experience tells him that the extent of the hazard will vary according to the number of vehicles that press their efforts to get through. We are satisfied that the negligence per se of anyone whose unlawful parking forges a condition of the kind just described is "in continuous and active operation up to the time of the harm." In the present instance, as we saw when we reviewed the evidence, two cars approaching the narrow opening from the south compelled Hollenbeck to wait until they had gone through. Before they had cleared the opening, the two motorcycle riders joined Hollenbeck at the north end of the opening. Those facts, together with the circumstance that the situation at the funnel engaged the attention of the men who were loading the truck, indicate that a stream of traffic was passing along the street and that the partial blockade offered promise of interesting developments. Under such circumstances, "in looking back from the harm to the actor's negligent conduct," a conclusion is not warranted that "it appears to the court highly extraordinary that it [the unlawful parking] should have brought about the harm." Rather the likelihood that harm would be inflicted upon someone was manifest.

The results that came from the unlawful parking in this case are unlike the sequence that followed the parking in the Falk case. There, the court did not believe that the collision which occurred in the nearby street intersection was the result of the unlawful parking. In the Caylor case, the negligence, consisting of the unlawful stopping of a bus upon the roadway, was viewed as a continuous and substantial factor in bringing injury to the plaintiff. The court referred to it as a blockade. It will be remembered that the driver stopped his bus upon the pavement when cars were

approaching from opposite directions. Presently the approaching cars collided alongside the bus. The cars were not deemed superseding causes. The explanation appears to be that the court regarded the unlawful parking as a blockade. The Swanson and Flynn cases will be recalled. In each of them the unlawfully parked vehicle, together with other objects, created narrow channels. In each instance the unlawful constriction was deemed a substantial, continuous factor in bringing injury to the plaintiff.

■ We believe that a finding was warranted by the jury that the negligence of the defendant was in continuous operation down to the instant when the plaintiff was injured, and that it was a substantial factor in bringing injury to him. Restatement of the Law, § 439, previously quoted, warrants a holding that Hollenbeck's act was not a superseding cause and did not protect the defendant from liability. See *Johnson v. Hoffman,* 132 Or 46, 284 P 567, and *Stamos v. Portland Electric Power Co.,* 128 Or 310, 274 P 915.

The remaining question is: Was the plaintiff guilty of contributory negligence? In *Butterfield v. Forrester,* supra, in which both parties were clearly negligent, Lord Ellenborough, in affirming judgment for the defendant, delivered the frequently quoted expression, 'One person being in fault will not dispense with another's using ordinary care for himself.''

In the case at bar, the jury evidently found that the plaintiff exercised due care for his own safety, for, it will be remembered, it returned its verdict for him. Therefore, the issue submitted by the defendant's single assignment of error is: Does the record afford any support for the verdict.

The defendant's truck confronted those in the area where it stood with the necessity of exposing them-

selves to the hazards which it illegally created or of turning to some other street. Restatement of the Law, Torts, § 474, says:

"If the defendant wrongfully deals with a highway so as to make it dangerous for public travel, a traveler injured thereby is barred from recovery by his failure to exercise reasonable diligence to ascertain the condition of the highway."

It is clear that the plaintiff apprised himself of the conditions which confronted him. He observed Hollenbeck's car as soon as he came into view of it and he watched its movements as it slowly came to a stop. He also took note of the truck and the cars which were parked along the west curb of the street.

We do not believe that the decisions cited by the parties involved situations sufficiently similar to those before us to warrant further attention. This is not an instance of a driver who failed to observe a car ahead or notice that it was standing still. The driver in this case, after taking notice of attendant circumstances, undertook to move forward into the only part of a street available for traffic and there encountered a vehicle which, without warning, was making for the same opening.

As we have indicated, no finding is warranted that the plaintiff failed to notice Hollenbeck's car, the defendant's truck and the other surroundings. Likewise, no inference can be drawn that the plaintiff was operating his motorcycle at excessive speed. He swore that he was moving ahead at about 20 miles an hour. A comparison of his progress down the street with Hollenbeck's appears to confirm his statement, and the slight damage suffered by the vehicles offers further confirmation. It is claimed, however, that the plaintiff voluntarily incurred the risk which the de-

fendant created and that he should have declined to subject himself to it. In other words, the claim that the plaintiff is guilty of contributory negligence is, in fact, a contention that he exercised faulty judgment.

■ The mere fact that the plaintiff subjected himself to a risk when he headed for the opening does not ipso facto condemn him of contributory negligence. All life is hazardous. The truth just stated is borne in upon us every time we, as pedestrians, cross a busy street intersection or, as drivers, venture out of our garage. Even the layman in his everyday speech compares the risks undergone with the advantages to be gained. The problem, therefore, is not whether the plaintiff exposed himself to a risk but, rather, whether he subjected himself to an unreasonable risk.

In the Comment which follows § 466, Restatement of the Law, Torts, it is said:

"* * * Last of all, his intentional exposure of himself to the known danger must be unreasonable. In order that it may be unreasonable it is necessary that a reasonable man in his position would not expose himself to it. This in turn depends upon the comparison between the quantum of danger, including both the probability of harm and its gravity, which the plaintiff realizes or has reason to realize as involved in the condition created by the defendant, with the value which the law attaches to the advantage which will be lost if the danger is not encountered."

In the Comment on page 786, the volume just cited says:

"Conduct is not negligent unless the magnitude of the risk involved therein so outweighs its utility as to make the risk unreasonable. Therefore, one relying upon negligence as a cause of action or defense must convince the court and jury that this is the case."

From 65 CJS, Negligence, p 727, § 121, we take the following:

"* * * Conduct involving an undue risk of harm to the actor is contributory negligence,".

It will be observed that the text says "undue risk of harm". Going on, the treatise says:

"and one who by his voluntary acts or omissions exposes himself to danger of which he has actual or imputed knowledge is guilty of negligence, if, under the same or similar circumstances, an ordinarily prudent person would not have incurred the risk of injury which such conduct involved. * * *

"Expressions are found in a number of decisions to the effect that one who voluntarily exposes himself or his property to a known and appreciated danger is guilty of negligence; but while an important factor to be considered in all cases, it is generally held that the fact that one knew and appreciated the danger, and voluntarily encountered it or failed to avoid it does not necessarily show negligence. The weight of authority supports the qualification that one is not negligent in voluntarily exposing himself to such danger, if, under the same or similar circumstances, an ordinarily prudent person would have incurred the risk which such conduct involved. Thus one may not be guilty of negligence in exposing himself or his property to known and appreciated danger where there is some reason of necessity or propriety to justify him in so doing, or where by the exercise of care proportionate to the danger one might reasonably expect to avoid the danger, * * *."

The following is quoted from 38 Am Jur, Negligence, p 859, § 182:

"* * * Exposure to known danger, however, is not always contributory negligence. It constitutes contributory negligence only where it is a voluntary and unnecessary exposure to a dangerous in-

strumentality or condition, the peril of which is appreciated by the plaintiff. Even the most prudent man is sometimes compelled to take risks; at least some risk is inherent in the ordinary activities of life. It has been said that the taking of a risk is negligent only where the risk is greater than is reasonably necessary to meet the ordinary requirements of business, or even pleasure."

This court, in *Saylor v. Enterprise Electric Co.,* 110 Or 231, 222 P 304, 223 P 725, adopted the enlightened view stated by the authorities from which we just quoted. In that decision, this court said:

"Mere knowledge upon the part of Saylor of the offending instrumentality does not constitute contributory negligence: * * *."

From Restatement of the Law, Torts, § 473, we take the following:

"If the defendant's negligence has made the plaintiff's exercise of a right or privilege impossible unless he knowingly exposes himself to a risk of bodily harm, the plaintiff is not guilty of contributory negligence in so doing unless the risk is unreasonable."

*Cunningham v. Silverstein,* 40 Lackawanna Jurist 42, after quoting the above, ruled:

"Considering the foregoing principles, we note that we are continually faced with the question as to whether both the risk involved and the conduct of the plaintiff were reasonable or unreasonable. We cannot say as a matter of law that the risk in itself is unreasonable, because certainly by the exercise of proper caution it is common experience that a person may proceed up or down an unlighted stairway, which is otherwise not defective, without danger of harm. If we are to declare, therefore, that the plaintiff was guilty of contributory negligence, such contributory negligence must be found, if at all, in the plaintiff's conduct. Should the plaintiff

have provided himself with a light? Should he have proceeded more slowly? Should he have completed closing the door before reaching for the banister? These are questions which must be answered in the light of reason, and since ordinarily what conduct is reasonable or unreasonable is a matter for the jury, we see no grounds for transferring that responsibility in this case to the Court. We think the question of contributory negligence was properly submitted to the jury and that its verdict must stand.''

The pavement on Southeast 20th avenue is 35 feet wide immediately north of the scene of the accident; then in the space of a very few feet it narrows to 30 feet. The defendant's truck stood at that specific spot and reduced the available width to an opening corresponding to a funnel. Thus, one approaching from the north, found the street narrowed to his disadvantage in the two-fold manner we just described. Both of the narrowing factors, as to him, were dangers.

When the plaintiff faced the issue as to whether he should aim for the opening, he must have realized that an attempt to go through would be confronted with at least four possibilities of peril. The main one arose out of the constriction of the street by the defendant's truck. Another, that Hollenbeck's car might move forward rapidly and close the opening. The third, that a car might come from the opposite direction and meet him in the opening. The fourth consisted of the cars which were parked adjacent to the west curb; in fact, Hollenbeck scraped one of them in passing through the opening.

The plaintiff, in determining whether he should proceed, did not have available the serenity of a judicial chamber in which to analyze the situation, but was required to decide upon the spot. Unlike us, he could

not review the problem in retrospect. All of the vehicles in sight were standing still, but he had momentum. He could, seemingly, get to the opening quicker than any other person. Delay in reaching a decision would cost him his momentum and might increase the number who were bidding for a chance to go through.

When the plaintiff was confronted with the issue as to whether he should head for the opening, his problem, apart from the amenities which each motorist owes to the others who find themselves in such a situation, was one of physics; that is, comparing his position with that of Hollenbeck's and his achieved momentum with Hollenbeck's lack of any, could he get through the funnel before Hollenbeck could get there—that was the problem he faced.

We think that a correct solution of the defendant's claim that the plaintiff was guilty of contributory negligence is dependent, in large measure, upon a knowledge of the exact course pursued by Hollenbeck immediately before the crash. According to the plaintiff, the Hollenbeck car stopped, as we have previously indicated, about 50 feet before it got to the truck and then, after moving ahead a short distance, stopped again. The plaintiff drew upon the blackboard representations indicating the place where each stop was made. Wilson supported the plaintiff's testimony that two stops were made. A slow, interrupted movement down a street can beget in the mind of a following motorist a desire to pass the one ahead. Hollenbeck denied that he made the first stop attributed to him by the plaintiff and Wilson, but conceded that he stopped when he was "about 30 or 40 feet" from the opening. Others placed that stop as far as 50 feet from the opening. Hollenbeck and the plaintiff were alongside each other, so the plaintiff swore, when each,

without knowledge of the other's purpose, started for the narrow portal. Since the plaintiff was then traveling at a rate of speed of 20 miles an hour, and Hollenbeck had been standing still up to that moment, the fact that presently they collided indicates that Hollenbeck acquired momentum at a very rapid rate, or that their respective distances from the portal were different than the evidence indicates. The quandary just mentioned suggests forcibly that one who undertakes to decide the issue of contributory negligence should have accurate knowledge of the facts. In this case, a foot or two is determinative. During the trial no plat or street diagram was employed. Hence, we have no help from such a source. The crude drawing which accompanies this opinion represents the work of one of our members and makes no claim whatever to accuracy or scaled measurements. However, during the trial, the blackboard drawings were made which we have mentioned. Unfortunately they are not available to us.

If, at the moment when the plaintiff and Hollenbeck started for the opening, the two were very near to it, a different conclusion might be drawn than if the two were back, say, 40 or 50 feet. If they were back a material distance, the plaintiff would have had less occasion to surmise that Hollenbeck intended to move into the opening and would have had more space in which to stop after seeing that a movement ahead was under way. Again, if the plaintiff was immediately adjacent to the Hollenbeck car, his distance from the portal was approximately the same as Hollenbeck's. But, if he was a few feet to the left, he then had a few feet more to travel than Hollenbeck in order to reach the portal. The evidence does not indicate clearly how far he was to the left of Hollenbeck, but he drew upon the blackboard a representation of his position and that of

Hollenbeck. He also drew a dotted line showing his exact course.

The plaintiff, as we have seen, testified that when the Hollenbeck car made its second stop it was "about" a car length from the opening. He estimated a car length as "about" 15 or 16 feet. Other witnesses thought that the distance was materially greater than the plaintiff's estimate. Hollenbeck, for example, deemed it 30 or 40 feet. Another placed it at an even greater distance. The jury, which is the agency invested by the constitution with the duty of determining from conflicting evidence the facts, after considering the problem just indicated, returned its verdict for the plaintiff.

When an attack is made upon a judgment which is supported by a verdict, every presumption is indulged in favor of the challenged judgment. The verdict will be respected if any reasonably conceivable state of the facts shows that no error was committed. An appellant always has the burden of proof. That means, so far as an appellate court is concerned, that he must affirmatively prove error.

The facts of which we are certain show that when the plaintiff and Hollenbeck were approximately alongside each other they started for the opening. The plaintiff had taken notice of the Hollenbeck car and of the other factors which affected his safety. At the critical moment, the plaintiff, unlike Hollenbeck, was in momentum and was proceeding at a rate of 20 miles an hour. One may be inclined to suspect that the plaintiff, without conforming to the amenities of the situation, tried to beat Hollenbeck to the opening. But since, in all likelihood, the jury considered that possibility, we must ignore it. The body entrusted with the sole power to try all issues of fact found that the plaintiff,

when he moved ahead, did not fail to exercise due care for his own safety. We cannot condemn its finding as wholly lacking in support. The result is that the assignment of error is lacking in merit.

Before closing this opinion, we revert to a fact which is mentioned in preceding paragraphs—the use of the blackboard evidence. Such method of examination is permissible, for, as stated in Wigmore on Evidence, 3d ed, § 789, "Man does not communicate by words alone." Since "One picture is worth a thousand words," blackboard drawings are, no doubt, persuasive, but, as is evident from this record, they are ephemeral. A litigant, who surmises that he may wish to appeal in the event that the trial court's judgment is adverse to him, should bear in mind that when a witness makes short-lived drawings upon a blackboard while giving his testimony, a transcription of the latter may be virtually unintelligible to us. He may thereby sustain a costly loss. This court, in previous decisions, has pointed out the disadvantages under which we study a record when places are located during the trial upon maps or plats and the record upon appeal fails to indicate the spots to which reference was made when the witness spoke of "here" and "there". See *Ervast v. Sterling,* 156 Or 432, 439, 68 P2d 137, and Oregon precedents therein cited. See, also, *State v. Morrow,* 158 Or 412, 75 P2d 737, 76 P2d 971.

Instances in which blackboard testimony provoked comment are *Dryer v. Brown,* 52 Hun 321; *State v. Ryno,* 68 Kan 348, 74 P 1114, 64 LRA 303. See, also, *Rachmel v. Clark,* 205 Pa 314, 54 A 1027, 62 LRA 959; *Cleveland, C., C. & St. L. Ry. Co. v. Snow,* 37 Ind 646, 74 NE 908; *South Bend Chilled-Plow Co. v. Giedie,* 24 Ind App 673, 57 NE 562; and Wigmore on Evidence, 3d ed, § 1168.

■ A party who anticipates that he may wish to appeal in the event of an unfavorable judgment should see to it that all drawings made during the trial that have an evidentiary status are produced upon material which can be transmitted to this court in the event of appeal.

The judgment of the circuit court is affirmed.